Gerald L. SEITZ, Appellant,

v.

LAMAR SAVINGS ASSOCIATION, Appellee.

No. 13326.

Court of Civil Appeals of Texas, Austin.

June 17, 1981.

Rehearing Denied July 8, 1981.

W. Thomas Buckle, Scanlan, Buckle & Fleckman, Austin, for appellant.

Thomas H. Watkins, Hilgers, Watkins & Kazen, Austin, for appellee.

POWERS, Justice.

Appellant, Gerald L. Seitz, sued appellee, Lamar Savings Association, in the 250th Judicial District Court of Travis County, alleging the statutory causes of action al-

lowed borrowers under Tex.Rev.Civ.Stat. Ann. arts. 5069–1.06 and 5069–8.02. Seitz averred that Lamar charged and received usury in an installment loan made to him by Lamar. The trial court found that Lamar did charge and receive usury but that its doing so was not intentional and resulted from *bona fide* error, a statutory defense to such actions. Accordingly, the trial court rendered judgment that Seitz take nothing by his suit. From this judgment, Seitz perfected his appeal to this Court. We reverse and render judgment for appellant.

Appellant's suit arose from the following events. In October, 1977, appellee made an installment loan to appellant in the original principal sum of $10,000.00. The loan was an "add on interest" loan where the finance charge, or total amount of interest over the term of the loan, was added to the principal sum and the combined amount of $12,399.84 was required to be repaid in 48 consecutive monthly installments of $258.33 each. The first such payment was due on December 10, 1977, and the final payment on November 11, 1981. The debt was evidenced by a form combining the customary promissory-note provisions and a security agreement. The security agreement granted appellee a security interest in a boat purchased by appellant with the loan proceeds. It also contained a provision that permitted acceleration of the debt if appellant permitted another security interest to attach to the boat or if appellee "in good faith" deemed the indebtedness to be "insecure."

After a substantial amount had been paid on the loan, appellee determined in April, 1978, to accelerate the installment indebtedness. Appellee's vice-president, Mr. Adair, utilized appellee's computer to ascertain the amount of principal owing, earned interest and unearned interest. He took these amounts from the computer, scratched them on a piece of paper, and delivered the paper to one of appellee's loan officers, Mr. Brewer. Mr. Brewer "communicated" the figures to appellee's attorney. The attorney composed and mailed to appellant a letter informing him that the debt was ac-

celerated under the two provisions of the security agreement mentioned above, and demanded payment of the debt within five days of appellant's receipt of the letter. The letter stated that "the amount due and payable [was] $7,674.10, which consist[ed] of principal in the amount of $5,743.70 and interest of $1,930.40."

On receiving the demand letter, appellant appeared at appellee's office on April 18, 1978, and tendered the sum of $7,674.10 demanded by appellee. Part of this sum was in the form of a bank check in the amount of $5,000.00 drawn by a third person on an out-of-town bank; the balance of $2,674.10 was in cash. The bank check was paid in due course.

Mr. Brewer accepted the bank check and the cash. He then exchanged them for a cashier's check issued by appellee's cashier in the amount of $7,674.10, presumably payable to appellee. This exchange was done in compliance with appellee's policy that the installment loan department should not handle cash.

Mr. Adair, after obtaining the cashier's check, but at a time not shown in the evidence, attempted to use the computer to credit appellant's account in the amount of $7,674.10. The computer rejected the attempt, as it was designed to do when an excessive amount was attempted to be credited in payment of an accelerated installment debt. Mr. Brewer then took the matter to Mr. Adair who said he would take care of it. The record does not reflect that any discussion was had with appellant at any time about the overpayment.

It is undisputed that the figure of $7,674.10 demanded in appellee's letter included usurious interest in that the $1,930.40 demanded therein as "interest" was, in fact, a sum that should have been deducted from the $7,674.10 in order to produce the correct amount of principal and earned interest ($5,743.70) that appellee was entitled to receive on early termination of the installment-loan agreement.[1] It is also

1. Usury is defined by Tex.Rev.Civ.Stat.Ann. art. 5069–1.01(d) as interest in excess of that · allowed by law. Article 5069–1.06 sets forth penalties for charging usury. At the time this

not disputed that the interest so demanded was in excess of double the amount allowed by law.[2]

Having admitted that it charged and received usury, appellee interposed the defense allowed by Article 5069–8.01(f) which provides:

"A person may not be held liable in any action brought under this Article [5069–8.01] for a violation of this Subtitle [Chapter 8, Title 79] . . . if such person shows by a preponderance of evidence that . . . the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adopted to avoid such violation. . . ." [3]

Having made the requisite findings of fact and conclusions of law, the trial court entered judgment for appellee based upon this statutory defense. We believe, however, that the record does not support the findings of fact and conclusions of law entered by the trial court.

It was shown at trial, by the testimony of appellee's vice-president, Mr. Adair, that appellee uses a computer to calculate the amount of principal and earned interest owing on early termination of an installment loan of the kind made to appellant. The computer also calculates unearned interest, which the witness termed a "rebate." [4] Lastly, the witness testified that the computer is programmed to reject any payment in excess of the principal owing plus earned interest.

With regard to the events pertinent to this suit, Mr. Adair testified that he deferred mailing to appellant the original copy of the promissory note and security agreement, pursuant to appellee's policy of waiting 20 days for out-of-town bank

suit was brought, subsection (1) of the statute provided that one who charges or receives usurious interest shall forfeit to the obligor twice the amount of the interest so charged and received, together with reasonable attorney's fees. Subsection (2) provided that where the interest charged or received is in excess of double the amount of interest allowed by the Subtitle (Chapter 1, Title 79), there shall be forfeited as an additional penalty all principal as well as all interest charged or received, plus reasonable attorney's fees. Although Article 5069–1.06 was amended effective August 27, 1979, this appeal concerns only the statute in effect when the suit was instituted in April, 1978.

2. Article 5069–8.02 provides that any person who violates the Subtitle (Chapter 8, Title 79) by charging or receiving interest or a time-price differential in excess of double the amount of interest or differential authorized by the subtitle shall forfeit to the obligor "as an *additional* penalty" all principal as well as all interest or time-price differential, and shall pay a reasonable attorney's fee to the obligor. The penalty so prescribed is "additional" to the penalty prescribed in Article 5069–8.01(a), which provides for forfeiture of twice the interest or time-price differential and reasonable attorney's fees. *The principal sum is not forfeited* under this subsection. Appellant did not allege a cause of action under Article 5069–8.01, though his brief in this Court prays for a recovery under that statute.

3. Appellee pleaded the following defense.
"The Defendant, LAMAR SAVINGS ASSOCIATION, would show the Court that said

sum of money was collected as a result of bona fide error and mistake."

Article 5069–1.06(1) provides that "there shall be no penalty for a violation [of that usury statute] which results from an accidental and bona fide error." It is impossible to know whether appellee intended to plead this rather simple defense, or whether the defense allowed by Article 5069–8.01(f) was intended but not fully pleaded. One would think that the defense allowed by Article 5069–8.01(f) was not intended for it applies only to an "action brought under this Article. . . ." As noted above, appellant brought actions under other articles: Articles 5069–1.06 and 5069–8.02. The parties have, however, predicated the appeal of the suit around the findings of fact and conclusions of law made by the trial court. These establish clearly the trial court's intention of awarding appellee judgment based upon the defense contained in Article 5069–8.01(f). We must therefore conclude that this defense, and the corollary right to an action under subsection (a) of that article, were tried by consent.

4. The unearned portion of the finance charge, or total interest computed over the term of the note less earned interest, is not a "rebate" because the borrower *never pays it before* the date his debt is accelerated. The word "rebate" is a misnomer; the term "unearned interest" correctly describes the excess interest which results from an early termination of the installment loan agreement.

checks to be paid by the payor bank. There was introduced in evidence a bank record having on it a handwritten note dated April 20, 1978, which read: "Hold overpayment 20 days, out-of-town check." Mr. Adair's testimony and this note reflect that on April 18, or not later than April 20, appellee knew that it had received an amount considerably in excess of the sum it was entitled to receive as principal plus earned interest. Mr. Adair testified that he did not notify appellant of the excess amount, though he called appellant over five times on the telephone without reaching him. The evidence is inconclusive whether the purpose of such calls was to inform appellant about the overpayment or another matter.[5] The trial court made no finding of fact or conclusion of law in this regard.

Based upon the foregoing, the trial court entered judgment for appellee based upon conclusions of law to the effect that appellee's charging and receiving usury were unintentional and the result of *bona fide* error which occurred notwithstanding the maintenance of procedures reasonably adopted to avoid such error or violations.

We believe these conclusions of law to be erroneous. Article 5069–8.01(f) requires that the procedures relied upon to establish a defense must be "maintained" and must be "reasonably adopted to avoid" violations of Subchapter 8, Title 79. There were two violations sued upon in this case: (1) the charging of usury and (2) the receiving of usury.

The *charging* of usury was found by the trial court to have occurred because of a *bona fide* error. The only evidence supporting this finding was evidence that unearned interest was not deducted in the demand letter due to a confusion of the various figures for principal owing, earned interest and unearned interest. One may draw the inference that the confusion occurred in the chain commencing when Mr. Adair took the figures from the computer, scratched them on a piece of paper delivered to Mr. Brewer, the loan officer, who "communicated" them to the bank's attorney. The evidence does not show when, how or by whom the error was committed. The exculpatory "procedure" relied upon in the trial court's conclusion of law is the computer program which calculates the correct amounts "coupled" with the program designed to reject overpayments.[6] The correct calculation of principal owing, earned interest and unearned interest cannot by itself be a procedure reasonably adopted to avoid the charging of usury in the exculpatory sense of Article 5069–8.01(f). Such calculations are not specifically directed at avoiding violations of the usury laws. While a computer will indeed prevent violations resulting from calculating errors, we believe the statute intends some additional procedure be adopted specifically to avoid violations of the statute. Otherwise, it may as well be said that the systematic hiring of alert and competent employees is sufficient to establish the statutory defense.

In *Mirabel v. General Motors Acceptance Corp.*, 537 F.2d 871 (7th Cir. 1976), *aff'd on other grounds*, 576 F.2d 729 (1978), *cert.*

---

5. Article 5069–8.01(c)(1) provides a statutory defense when a lender discovers within 60 days a violation of Chapter 8, Title 79, and corrects the violation by refunding "any amount in excess of that authorized by law ..." To avail himself of that defense, the lender must also give written notice to the obligor of the violation. This defense was not pleaded by appellee, nor is there any evidence of written notice being given to appellant of the violation, and no attempt was made at refunding the excess interest or finance charge before appellant filed his suit.

6. We fail to see the logic of "coupling" the two computer programs, one designed to supply the correct amounts of principal owing, earned interest and unearned interest, the other to reject excess payments. The parties agreed at trial that the demand letter constituted the "charging" of usury. A lender must compute the correct amount of principal owing and earned interest before demand is made in order to avoid charging usury. *See* Note 54 Texas L.Rev. 652 (1976). Any payment pursuant to such a demand must necessarily follow the demand in time. The evidence is undisputed that the second computer program is resorted to at the time of attempted payment. It cannot logically be said that this procedure will prevent the charging of usury which has already taken place.

*denied*, 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 695 (1978), the Court considered a statutory defense to liability under the Federal Truth-in-Lending Act, 15 U.S.C. § 1601, *et seq.*, which is almost identical to that set forth in Article 5069–8.01(f). The Court said:

"[M]ore than just the maintenance of procedures which [are] designed to provide proper disclosure calculations [is required]. Rather, it required procedures designed to avoid and prevent errors which might slip through procedures aimed at good faith compliance. This means that the procedures . . . [must] contain an extra preventive step, a safety catch or a rechecking mechanism. . . . Not only [must] procedures designed to avoid bona fide errors be established by creditors if they seek exemption under this section but also, these procedures [must] be *maintained*. This means that the creditor must show that the proper procedures were followed time in and time out. . . ."

We believe that Article 5069–8.01(f) requires the same interpretation. There is in the record some evidence, sparse though it may be, that appellee routinely and systematically uses its computer to ascertain, on acceleration of an installment debt, the correct amounts of principal owing, earned interest and unearned interest. We hold, however, that there is insufficient evidence in the record that appellee maintained an "extra preventive step, a safety catch or a rechecking mechanism . . ."designed to avoid the statutory violation of charging usury.

■ The *receiving* of usury was found by the trial court to have occurred because of a *bona fide* error, which was the same error as that which resulted in the charging of usury, *i. e.*, the confusion of the figures supplied by the computer to Mr. Adair when appellee first determined to accelerate appellant's indebtedness. The trial court ruled that appellee had established the statutory defense allowed by Article 5069–8.01(f), concluding that the computer program designed to reject excess payments was one reasonably adopted by appellee to avoid the receipt of usury. We believe that the computer program designed to reject the credit of excess payments is one obviously fitted in theory to the purpose of avoiding the statutory violation of receiving usury. There is, however, insufficient evidence in the record that appellee's "procedure" includes a systematic resort to the computer *before* money is received, thereby *preventing* the receipt of usury. In the present case, for example, the evidence is conclusive that the sums tendered by appellant were first received, then converted into a cashier's check presumably payable to appellee before the amount of the cashier's check was attempted to be checked against the computer. Thus, the usury was unquestionably received and converted into appellee's own obligation (the cashier's check) before resort was had to the procedure claimed by appellee to establish the statutory defense. This may have been an unusual or exceptional variation from appellee's procedure to verify the correct sums before receiving an amount tendered to it; however, there is insufficient evidence in the record to establish such a procedure. We hold, then, that there was insufficient evidence to support the trial court's finding of fact and conclusions of law to the effect that appellee maintained a procedure reasonably adopted by it to avoid receiving usury.

We are not to be understood as saying that because a violation occurs, such occurrence alone demonstrates that no procedure was maintained to avoid violations actionable under Article 5069–8.01. We hold simply that in the state of the present record, there is insufficient evidence that appellee *maintained* a systematic procedure reasonably adopted by it specifically to detect and prevent such violations before they occur. As was the case in *Mirabel*, we believe the Legislature intended that the lender maintain "an extra preventive step, a safety catch or a rechecking mechanism," followed systematically and designed specifically to detect and prevent violations. We think this construction of the statute is compelled

by the very terms in which the statutory defense is stated: "... the violation ... resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adopted *to avoid such violation* ..." (emphasis added). The procedures must be directed at avoiding *violations*, not *bona fide* errors. The word "maintain" implies that the procedure must be systematically applied. While the computer's supplying the correct amounts will avoid clerical errors in computation, it does nothing "to avoid and prevent errors which might slip through procedures aimed at good faith compliance...." *Mirabel v. General Motors Acceptance Corp., supra.* In contrast, the use of the computer to detect overpayments could indeed have the effect of preventing the receipt of usury, a violation of the statutes, if resorted to systematically *before such receipt.* In this case, however, there is insufficient evidence that the computer was used systematically in that manner. On either ground then, we must reverse the judgment of the trial court based upon the proposition that the statutory defense was established by the evidence in the record, first against the claim of charging usury, second to the claim of receiving usury.

■ Appellant contends the trial court erred in not awarding him reasonable attorney's fees. Article 5069–8.02 provides that if a person charges in excess of double the legal amount of interest, he shall pay "reasonable attorney's fees actually incurred by the obligor in enforcing the provisions of this Article." The parties stipulated reasonable attorney's fees in this case to be $1,250.00. Having found appellee violated Article 5069–8.01, we hold that appellant is entitled to recover attorney's fees in the amount of $1,250.00.

We therefore reverse the judgment of the trial court and render judgment that appellant Seitz recover $15,791.20 as penalties under Article 5069–8.01, together with $1,250.00 in attorney's fees under Article 5069–8.02.